LENOX v. LENOX et al.

(Supreme Court, Appellate Division, Fourth Department.  May 6, 1908.)

1. WILLS—CONTRACT TO DEVISE—BREACH—REMEDIES.

A father told his son that, if he would advance $1,500 towards the price of a farm, he would will another farm on which the son resided to the son, on the latter agreeing, after the father's death, to pay other children $2,500, the father's wife to have the life use of the farm, and one of the daughters to have a home there during life.  It did not appear that the son formally accepted the proposition, nor that he did anything from which an acceptance could be implied, except that he continued to remain on the farm, paying rent therefor, and did advance $500 of the $1,500; nor did it appear that he was able to perform any of the obligations imposed by the will.  *Held* that, on the father's conveying the property, the son could not maintain an action in equity to establish his interest in the premises and to acquire a lien thereon, but that his right of action, if any, was one at law for damages; it not appearing that the father was unable to respond in damages.

2. SAME.

The father, after the son's death, told the son's widow that, if she would stay on the farm, he would do the same by her that he would by the

son, and would make a new will in her favor, and thereafter made a will in all respects like the former will, except that the widow's name was substituted for that of her deceased husband. The widow did not in any way obligate herself to perform the conditions imposed upon her by the second will, and there was no proof that she was in any sense able to perform such conditions, though she did remain upon the farm for some time, doing ordinary farm work. *Held,* that the widow had no cause of action in equity against the father; her cause of action, if any, being for breach of the contract.

Appeal from Equity Term, Erie County.

Action by Orpha Lenox against James Lenox and others. From a judgment for plaintiff, defendants appeal. Reversed, and new trial granted.

The action was commenced on the 13th day of July, 1907, practically to obtain the relief awarded by the judgment.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Fred J. Blackmon, for appellants.

Ernest F. Kruse, for respondent.

McLENNAN, P. J. The defendant James Lenox, who at the time of the trial was 74 years of age, was the owner of the premises described in the complaint, consisting of a farm of about 200 acres. The plaintiff is the widow of Elwin Lenox, the son of James Lenox. Elwin died intestate on the 22d day of April, 1891. He left him surviving the plaintiff, and one child, Odessa Lenox, who died May 23, 1902, intestate and without issue. The defendants Sarah A. Taylor and Frances E. Lenox are the daughters of James Lenox. In March, 1883, the plaintiff and Elwin Lenox were married, and in October following they moved on to his father's farm, the premises in question. The father and his family, at that time consisting of himself, wife, and unmarried daughter Frances, resided upon an adjoining farm. In March of the following year (1884) James Lenox, his wife, and daughter Frances moved on to the farm in question, and lived with the plaintiff, her husband, and their daughter Odessa as one family, until Elwin's death in 1891, and during all of that time the plaintiff did the work of the household for her husband. After Elwin's death the plaintiff continued to work as before, the family then consisting of herself and daughter, Odessa, James Lenox and his wife, until her death, which occurred in 1895, his daughter Frances, and a hired man. This continued until December 20, 1898, when the plaintiff and her daughter left the farm. This was seven days before the marriage of James Lenox to his second wife, one Mary Southwick, and it is apparent that the plaintiff left because of such approaching marriage, which was opposed by her. At all events she was discharged by or left with the consent of James Lenox. Soon after James Lenox's second marriage, his wife became deranged, and was removed to a hospital. He then engaged the plaintiff to return to the farm and work for him, agreeing to pay her $2.50 per week for her services, which he did during a part of the year 1899, and until she finally quit in October of that year.

The plaintiff testifies that, when she and her husband moved on to

the farm in 1883, it was fully stocked with cattle, although there were no horses on it except colts; that the buildings were in good repair; that during the first year the farm was worked on shares, each party having one-half of the proceeds; that after the first year and until Elwin died he paid all expenses, and paid to his father $100 per year. The plaintiff further testifies: That in the year 1888, after she and her husband had moved on to the farm and James Lenox with his wife and daughter had become members of the household, she heard a conversation between her husband and the defendant James Lenox. That James Lenox said he wanted to get the Washburn farm, so called, back into the family "and, that if we would help pay the difference between the two farms, the Washburn farm and the one then occupied by Sarah Taylor, he would buy it and let his daughter, Sarah Taylor, have it. This farm that they live on. At first it was talked over about paying $1,000, and then he thought the buildings needed repairing, and then he said we were to pay $1,500 and he would call that paid toward our interest in this farm described in the complaint." That in the same conversation James Lenox further said:

"He would will the premises described in the complaint to Elwin E. Lenox provided after his (James Lenox) death he (Elwin) paid Sarah Taylor $500 and Frances E. Lenox $2,000, and Ruth Lenox (the wife of James) was to have the life use and control of the farm as long as she lived; and his daughter, Frances E. Lenox, was to have her home there as long as she lived."

The plaintiff further testifies that about two months after such conversation James Lenox made and executed a will containing the above provisions, which he showed to her. From the time such will was executed in 1888 to 1891, when Elwin died, all the parties resided upon the farm as one family. It does not appear that Elwin formally accepted the proposition so claimed to have been made by his father, nor does it appear that he did anything from which an acceptance could be implied, except that he remained on the farm as before, continuing to pay $100 rent for the same, and made some permanent improvements thereon, put a granary in the barn, a roof on the pigpen, laid flooring in the barn, put a pump in the well, partly built a sugarhouse, did some ditching, built some fences, etc. Elwin did not by any express agreement obligate himself to pay Mrs. Taylor $500 and Frances $2,000 upon the death of his father, and to give the use and control of the farm to his mother, Ruth, during her life and to furnish a home thereon for his sister Frances while she lived. According to plaintiff's version of the transaction, the situation and relation of all the parties continued for the three years after such alleged conversation took place and until Elwin's death precisely the same as they had been after Elwin and his family had moved on to the farm, and before the date of such alleged conversation. The plaintiff, however, testifies:

"We afterwards [after such conversation] paid Sarah A. Taylor $1,500 [being the amount which as she claims they were required to pay by James Lenox]. We took a receipt, which reads as follows:

" 'North Collins, Oct. 19, 1888.

" 'Received of Elwin Lenox $1500. towards my share out of father's estate.

" '[Signed] Mrs. Sarah A. Taylor.' "

Notwithstanding the testimony of the plaintiff in which she says "we paid Sarah A. Taylor $1,500," it appears without contradiction that $1,000 of that sum was paid to the owner of the Washburn farm by the defendant James Lenox, that no more than $500 of it was paid by Elwin, and that what he did pay was obtained by him from the avails of the farm. It seems to me that the language alleged to have been used by the defendant (it does not appear that either Elwin or the plaintiff said a word in response) and the acts of the parties claimed to have been done in pursuance thereof are altogether too uncertain and indefinite to base a determination by a court of equity that Elwin thereby acquired an interest in the premises in question and such as to constitute a lien thereon, even assuming that the defendant James Lenox conveyed the premises, as he subsequently did, and thus made it impossible for Elwin to acquire title to the farm under the will which his father had made. Elwin only paid $500 of the $1,500, which represented the difference in value between the Washburn farm, which James Lenox wanted in the family, and the farm then occupied by his daughter, Sarah. Elwin had in no manner either by word or action obligated himself to remain upon and work the farm until his father's death, to pay the sum of $2,500 to his two sisters upon the happening of that event, and to furnish a home upon the farm for and support his mother and sister Frances, during their natural lives. Neither does it appear that he was able to perform any of such obligations.

Construing the language of the defendant James Lenox and the acts claimed to have been done pursuant thereto most favorably to Elwin had he been living, we think he would only have had a cause of action at law against his father as for breach of contract. If in such action a contract was established, as claimed, and the father had repudiated it or rendered performance on his part impossible, Elwin would have been entitled to such judgment as would represent the damages sustained by him because of its breach by James Lenox, provided he had performed or was ready to perform the obligations assumed by him. The $500 paid by him, if so paid, would not necessarily measure his damages, but could be considered in determining the value of the contract. There is no suggestion in the complaint or proof that James Lenox has not been at all times perfectly able to to respond in damages and to pay any judgment which might be recovered against him, and therefore, and in view of all the facts, no cause of action in equity existed in Elwin's favor, even if the father had repudiated the contract before Elwin's death. The plaintiff, as we have seen, brings this action individually, and not in any manner as representative of her deceased husband. She claims to have succeeded to the rights of her husband and to recover the $500 paid by him by virtue of a conversation had with James Lenox a few days after her husband's death.

The plaintiff testified:

"After Elwin died James Lenox asked me if I would stay with them. I said: 'Yes, providing you want me.' He said they needed me worse than before. Then James Lenox said if I would stay and see them through, he would do the same by me that he would by Elwin Lenox, said he would make

a new will just the same as the first with the exception it would go to me myself, instead of Elwin Lenox."

That soon after such conversation James Lenox made a will in all respects like the former will, except that plaintiff's name was substituted for that of her deceased husband. That he showed such last will to the plaintiff, and kept it four or five years. Plaintiff testified that after such conversation, and after the execution of such last will, she was at the head of the household. "I did the housework and milking and all such work as goes on a farm. He [James Lenox] kept 30 or 32 cows. I milked eight every night and morning. Made garden, fed calves, raked hay, drove horse to unload hay, washed milk cans, took care of the chickens, and in the house I did everything, cooking, sewing, making, mending, papering, and painting. I continued to do this work up to December 18, 1898. I went away December 20, 1898. I stayed continuously up to that time. Those services were worth $3.50 or $4 per week. I have never had any pay for the work during all that time. James Lenox had no hired help, except a hired man, except four weeks when Ruth Lenox [his wife] was sick."

Assuming that such conversation took place, that the new will was made in plaintiff's favor precisely as stated by plaintiff, and that she remained and worked upon the farm pursuant thereto, we fail to see how individually she became entitled to the benefits of the contract made between her husband and his father, especially how she is entitled to recover the $500 alleged to have been paid by her husband, and which, with interest, constitutes a substantial part of the judgment appealed from. There was no transfer of Elwin's interest to the plaintiff, and, whatever its amount, it belonged to his estate, to be first devoted to the payment of his debts, if any, and then to be distributed in accordance with the provisions of the statute of distributions. But, assuming that the last conversation took place as related by the plaintiff, we think it is too uncertain and indefinite upon which to base a finding that she thereby became entitled to an interest in the real estate in question. She did not in any manner obligate herself to perform the conditions imposed upon her by the second will, and there is no proof which indicates that she was in any sense able to perform any or either of them. Indeed, she after her husband's death did not work or manage the farm, did not assume any responsibility respecting it, did not provide for James Lenox or his family. She simply did the work of the household. But it appears that the plaintiff did not remain on the farm and continue to work for James Lenox because of the conversation above quoted. She testified James Lenox subsequently said:

"If I would stay there, he would give me one of those deeds and Frances E. Lenox the other, and so I stayed on that ground."

It appears that, when the plaintiff finally left the farm, she and James Lenox exchanged receipts, she receipting to him for all services rendered by her, and he receipting to her for the maintenance and support of herself and daughter. But plaintiff states, in substance,

that the receipt so given by her was signed under duress, although she admits both are in her handwriting. But, independent of such ·consideration, we conclude that plaintiff's cause of action against the defendant was one at law, and not in equity, that her cause of action, if any, arises because of a breach of contract by the defendant entered into between him and her, and, it not appearing that the defendant is not responsible and able to respond in any damages sustained because ·of such breach, no case is made out for the intervention of a court of equity. The value of plaintiff's services should be ascertained in a court·of law before a jury. If, in addition, she has sustained damages by breach of contract by defendant, such damages can also be recovered, and any judgment rendered in her favor, therefore, if not paid, and execution is returned unsatisfied, an action in equity may be maintained to set aside the conveyance made by James Lenox to his two daughters, if made with intent to hinder, delay, and defraud the plaintiff.

There being no proof that James Lenox is not responsible and able to respond in any amount which may be awarded against him because of his alleged breach of contract, we think this action cannot be maintained, and that defendant's motion for a nonsuit should have been granted.

It follows that the judgment appealed from should be reversed, and a new trial granted, with costs to appellants to abide event.

Judgment reversed, and new trial granted, with costs to appellants to abide event. All concur, SPRING, J., on the ground that the judgment is against the weight of the evidence.